# EXHIBIT 1

OLIVIER A. TAILLIEU (SBN 206546)
*otaillieu@dominguezfirm.com*
MARTIN J. KANAREK (SBN 261982)
*martin.kanarek@dominguezfirm.com*
JENNIFER R. BAGOSY (SBN 223145)
*jennifer.bagosy@dominguezfirm.com*
**THE DOMINGUEZ FIRM**
3250 Wilshire Blvd., Suite 2200
Los Angeles, CA 90010
Telephone: (213) 388-7788
Facsimile: (213) 388-9540

Attorneys for Plaintiff MYA HENDRIX

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF SAN DIEGO**

MYA HENDRIX, an individual

Plaintiff,

v.

CITY OF SAN DIEGO, a public entity; SUE MARVIN, an individual; TONETH DAVIS, an individual; LAURA OROZCO, an individual; ROXANNE CAHILL, an individual; SAN DIEGO POLICE DEPARTMENT POLICE CHIEF DAVID NISLEIT, an individual; and DOES 4 to 50, inclusive,

Defendants.

---

CITY OF SAN DIEGO, a public entity

Cross-Complainant

FRANCISCO ARANDA, an individual; CESAR ALVARADO, an individual; MICHAEL PEDRAZA, an individual; BRITNEY CANALE, an individual; and ROES 1-50, inclusive,

Cross-Defendants

**FIRST AMENDED COMPLAINT FOR DAMAGES**

1. **Gross Negligence and Bad Faith**
2. **Municipal Liability - Deliberate Indifference to Constitutional Rights: Life, Liberty, Safety and Medical Needs (42 U.S.C. § 1983)**
3. **Municipal Liability – Ratification (42 U.S.C. § 1983)**
4. **Municipal Liability – Inadequate Training (42 U.S.C. § 1983)**
5. **Municipal Liability – Unconstitutional Custom, Practice, or Policy (42 U.S.C. § 1983)**
6. **Unreasonable Search and Seizure - Denial of Constitutional Rights: Life, Liberty, Emergency Services and Medical Care (42 U.S.C. § 1983)**

**DEMAND FOR JURY TRIAL**

## FIRST AMENDED COMPLAINT

COMES NOW Plaintiff, MYA HENDRIX (hereinafter referred to as "Plaintiff") for causes of action against Defendants, CITY OF SAN DIEGO ("City"); SUE MARVIN ("Marvin"); TONETH DAVIS ("Davis"); LAURA OROZCO ("Orozco"); ROXANNE CAHILL ("Cahill"); SAN DIEGO POLICE DEPARTMENT POLICE CHIEF DAVID NISLEIT ("Nisleit") and DOES 4 through 50, inclusive, (hereinafter collectively referred to as "Defendants") who complains and alleges as follows:

### JURISDICTION AND VENUE

1. This is an unlimited case, over which this Court has jurisdiction. The total amount of damages sought by Plaintiff exceeds $25,000.

2. This Court has personal jurisdiction over Defendants because at all times mentioned herein Defendants resided, were organized, existed in, or conducted business in the State of California.

3. In addition, venue is proper in the County of San Diego pursuant to California Code of Civil Procedure Section 395(a) because the injury giving rise to the present action took place in the County of San Diego, and the Defendants, or some of them, reside, are located, and/or have their principal place of business in the County of San Diego. This venue is also proper for an action in the Superior Court of San Diego because the incident in question occurred, and all defendants acted in bad faith and in a grossly negligent manner in the city of San Diego, county of San Diego, within the jurisdiction of the San Diego Superior Court.

### PARTIES

4. Plaintiff, at all times herein relevant, is and was a resident of San Diego located in San Diego, California.

5. Plaintiff is informed and believes, and on that basis alleges, that Defendant City is, and at all times pertinent to this action has been, a municipal corporation doing business in the County of San Diego, State of California.

6. Plaintiff is informed and believes, and on that basis alleges, that Defendants

Marvin, Davis, and Orozco were 911 emergency call dispatchers for the City's emergency and non-emergency phone lines, and other City employees, on April 11, 2018, who upon information and belief are employees of the City and adult residents of the County of San Diego, State of California. Defendants Marvin, Davis, and Orozco have previously been substituted in to this action as DOES 1-3, respectively.

7. The true names, capacities, whether individual, corporate, association or otherwise of Defendants 4-50, inclusive, are unknown to Plaintiffs, who otherwise sue these Defendants by their fictitious names. Plaintiffs will seek leave to amend this complaint to show the true names and capacities of these Defendants when they have been ascertained. Each of the fictitiously named Defendants is responsible in some manner for the conduct or liabilities alleged herein.

8. DOES 4 through 25 include additional dispatchers employed by the City of San Diego Police Department (hereinafter "SDPD"), and DOES 4-25, with Defendants Marvin, Davis and Orozco, are collectively referred to herein as "Dispatcher Defendants."

9. At all relevant times, the Dispatcher Defendants were acting under color of law within the course and scope of their duties as police dispatchers for the SDPD; and were acting with the complete authority and ratification of their principal, Defendant City, and their supervisors, Defendants Cahill and Nisleit.

10. Plaintiff is informed and believes, and on that basis alleges, that Defendant Cahill was and is the Police Dispatch Administrator for the City and as such was responsible for training and hiring of police dispatchers in the City. At all relevant times, Defendant Cahill was acting under color of law within the course and scope of her duties as a dispatch supervisor for the SDPD and the City; had supervisory and policymaking authority for the SDPD and the City, including supervision of the Dispatcher Defendants; and was acting with the complete authority and ratification of her principal, Defendant City.

11. Plaintiff is informed and believes, and on that basis alleges, that Defendant Nisleit was and is the Chief of Police of the SDPD. At all relevant times, Nisleit was a managerial, supervisorial, and policymaking employee of the City and SDPD who was acting under color of

law within the course and scope of his employment for the City and SDPD at the time of this incident. At all relevant times, Nisleit was acting with the complete authority and ratification of his principal, the City.

12. DOES 26-50 are additional managerial, supervisorial, and policy-making employees of the SDPD who were acting under color of law within the course and scope of their employment for the SDPD at the time of the incident(s) of April 11 and 12, 2018 as described in this Complaint. At all relevant times, DOES 26-50 were acting within the complete authority and ratification of their principal, Defendant CITY. Upon information and belief, DOES 26-50 were residents of or conducted business in the County of San Diego, California, at all relevant times.

13. DOES 26-50, with Defendant Cahill and Defendant Nisleit, are collectively referred to herein as the "Policymaking Defendants". The Policymaking Defendants are sued in their individual capacities.

14. At all times mentioned herein, each and every Defendant, including DOES 4 through 50, was the agent of each and every other Defendant and had the legal duty to oversee and supervise the hiring, conduct, and employment of each and every Defendant.

15. All of the acts complained of herein by Plaintiffs against Defendants, including DOES 4 through 50, were done and performed by said Defendants by and through their authorized agents, servants, and/or employees, all of whom at all relevant times herein were acting within the course, purpose, and scope of said agency, service, and/or employment capacity. Moreover, Defendants and their agents ratified (or will ratify) all of the acts complained of herein.

16. In doing the acts and failing and omitting to act as hereinafter described, Dispatcher Defendants were acting on the implied and actual permission and consent of Defendants Cahill, Nisleit and Defendant City.

17. Plaintiff is informed and believes that at all relevant times Cesar Alvarado, Francisco Aranda, Michael Pedraza and Britney Canale (collectively, "Cross-Defendants") were adult residents of the City of San Diego, State of California.

//

## BASIS FOR LIABILITY - STATE LAW CLAIMS

18. Pursuant to California Government Code Section 820(a) "Except as provided by statute (including Section 820.2), a public employee is liable for injury caused by his act or omission to the same extent as a private person."

19. Pursuant to California Government Code Section 815.2, Defendant City of San Diego, as a public entity, is liable for any injury proximately caused by any act or omission of its employees made within the scope of his or her employment, if the act or omission would have given rise to a cause of action against the employee.

20. Pursuant to California Health & Safety Code Section 1799.107, Defendant City, emergency rescue personnel and the employing public entity are liable for injury caused by an action taken by the emergency rescue personnel to provide emergency services if the action taken was performed in bad faith or in a grossly negligent manner.

21. Plaintiff is informed and believes, and on that basis alleges that each of these fictitiously named defendants is responsible in some manner for the occurrences herein alleged and that Plaintiff's damages as herein alleged were proximately caused by their conduct.

22. Within the time provided by law, Plaintiff filed a claim with the government entity Defendant City of San Diego, which was denied on August 20, 2018.

## FACTS COMMON TO ALL CAUSES OF ACTION

23. Plaintiff re-alleges and incorporates by reference all prior and subsequent paragraphs as though fully set forth herein.

24. On April 11, 2018, Cesar Alvarado, Michael Pedraza and Britney Canale violently kidnapped the Plaintiff, who was 19 years old.

25. At approximately 7:00 a.m. on April 11th, 2018, Plaintiff called her mother Misti Hendrix stating that she had been kidnapped and that she would be killed unless three individuals (later identified as Cesar Alvarado, Michael Pedraza and Britney Canale) received a ransom of $2,500.

26. Plaintiff's mother immediately called the City's 911 emergency phone line and

informed the dispatcher (Defendant Sue Marvin) that her daughter had called saying she had been kidnapped.

27. According to the City's government website, (https://www.sandiego.gov/fire/services/911/whathappens) when a person calls 911 to report an emergency in San Diego, the call first goes to the San Diego Police Department.

28. When a police department in California receives a call reporting a missing person, California law prescribes specific procedures for the proper handling of these reports, particularly reports of missing persons under 21 years of age. California Penal Code § 14214(a) provides, "it is the duty of all law enforcement agencies to immediately assist any person who is attempting to make a report of a missing person or runaway." California Penal Code section 14211 states, in relevant part (with emphasis added):

a. All local police and sheriffs' departments shall accept any report, by any party, including any telephonic report, of a missing person, including runaways, ***without delay*** and shall ***give priority to the handling of these reports*** over the handling of reports relating to crimes involving property.

b. In cases of reports involving missing persons, including, but not limited to, runaways, the local police or sheriff's department ***shall immediately take the report and make an assessment of reasonable steps to be taken to locate the person*** by using the report forms, checklists, and guidelines required under Section 13519.07.

c. If the missing person is ***under 21 years of age, or there is evidence that the person is at risk***, the police department or sheriff's department shall broadcast a "Be On the Lookout" bulletin, without delay, within its jurisdiction.

d. If the ***person reported missing is under 21 years of age, or if there is evidence that the person is at risk,*** the law enforcement agency receiving the report shall, ***within two hours after the receipt of the report, electronically transmit the report to the Department of Justice*** via the California Law Enforcement Telecommunications System for inclusion in the Violent Crime Information Center and the National Crime

Information Center databases.

29. Plaintiff's mother's call to Dispatcher Marvin (and the other Dispatcher Defendants) was a report of a missing person covered by Penal Code §§14210, *et seq*.

30. The California Commission on Peace Officer Standards (POST) developed guidelines and curriculum pursuant to legislative mandate under California Penal Code § 13519.1 to establish a course of instruction for training law enforcement officers and dispatchers to investigate and resolve missing persons and runaway cases. According to the POST "Missing Persons Investigations Guidelines & Curriculum," available at https://post.ca.gov/Missing-Persons (hereinafter the "POST Guidelines"), one category of Missing Persons is "**Stranger Abduction**," which is defined as "Child ***or adult*** who is ***taken or abducted against their will by an unknown person or a known person*** who is not a family member." The POST Guidelines advise that California Penal Code §§ 14210, et seq., applies to missing persons reports including reports of Stranger Abduction.

31. The POST Guidelines further direct police and dispatchers to take steps including the following:

a. Dispatchers taking the initial call should first determine if the case falls within one of the Missing Person categories (which include "Stranger Abduction")

b. Dispatchers should be sensitive to the caller's feelings.

c. Officers should interview the reporting party and identify and interview potential witnesses.

32. However, when Plaintiff's mother called 911 to report that her daughter had been kidnapped, Dispatcher Defendant Marvin did not determine that this call fell under the Missing Person category of Stranger Abduction; did not ask Plaintiff's mother to identify Plaintiff's known associates, potential abductors, or other potential witnesses; did not "give priority" to the report; did not "make an assessment of reasonable steps to be taken to locate the person;" and did not create a "Be On the Lookout" bulletin or transmit the report to the Department of Justice in light of the fact that Plaintiff was under 21. Marvin also did not transfer Plaintiff's mother to anyone else within the

San Diego Police Department to take any or all of these steps.

33. Instead, in direct violation of California Penal Code § 14211, Defendant Marvin, acting in the course and scope of her employment with the City, took the following grossly negligent actions to persuade Plaintiff's mother that this was a "scam" and that no further action was needed by either Defendant Marvin or Plaintiff's mother to save Plaintiff from the kidnapping:

- Defendant Marvin persisted in her effort to convince Plaintiff's mother to stand down and ignore her daughter's call, because kidnapping "scams" were common in the City of San Diego.
- To further persuade Plaintiff's mother to take no action, Defendant Marvin told Plaintiff's mother of a specific situation in which a child's parents were divorced, a person called the custodial parent to say "we have your child and we are holding your child ransom," the custodial parent paid the ransom, and it was later determined that the non-custodial parent had taken the child and faked the kidnapping.
- Defendant Marvin claimed that any drug use by Plaintiff (past or present) would confirm Defendant Marvin's conclusion that the call was a scam and accused Plaintiff's mother of not having a good relationship with her daughter, because she did not have Plaintiff's address.

Despite Plaintiff's mother's repeated protests that her daughter would never concoct such a scam, Defendant Marvin violated all aspects of California Penal Code section 14211 and actively convinced Plaintiff's mother to do nothing to save her daughter.

34. Because Defendant Marvin acted directly contrary to California's requirements for police departments in handling missing persons reports, and instead affirmatively persuaded Plaintiff's mother that the instant situation was a scam and not an emergency, Plaintiff's mother acted in reliance on Defendant Marvin's words and did not take any additional action either to find and save her daughter herself, or to contact any other law enforcement agencies such as neighboring cities' police departments, the County of San Diego, or the FBI to find and protect her daughter, or to try to borrow or otherwise secure the $2,500 ransom.

35. Between approximately 12:30 p.m. and 1:00 p.m. the same day, Plaintiff's daughter called Plaintiff again. This time, Plaintiff sounded panicked and was crying on the phone. She said her abductors were going to kill her. A male and female voice both told Plaintiff's mother that they were going to kill Plaintiff if Plaintiff's mother did not pay the $2,500 immediately. Plaintiff's mother heard the kidnappers hurting Plaintiff with a taser or some other implement. Plaintiff sounded muffled as though she was being gagged. In the background Plaintiff's mother heard a man's voice state, "You don't know how serious this is."

36. In complete distress, Plaintiff's mother again immediately called the City's 911 emergency phone line and again reported the kidnapping and the new threat that her daughter would be killed. Plaintiff's mother spoke to Dispatcher Defendant Toneth Davis, who was acting in the course and scope of his or her employment with the City. Plaintiff's mother attempted again to report Plaintiff's kidnapping, but Defendant Davis interrupted her and said, "this is not an emergency." Plaintiff's mother protested that the kidnappers were going to kill her daughter and that it was an emergency, but Davis said, "I have to keep calls open for emergencies," and told her to call the SDPD's non-emergency line before hanging up on Plaintiff.

37. Defendant Davis, like Defendant Marvin, acted in complete disregard of the California requirements for the handling of missing persons reports. Defendant Davis, acting in the course and scope of her employment with the City, took action by affirmatively persuading Plaintiff's mother that the instant situation was not an emergency, and Plaintiff's mother acted in reliance on Defendant Davis's words and actions and called the City's and SDPD's non-emergency line and did not take more immediate action either to find and save her daughter herself, or go to a local police station, or to contact any other law enforcement agencies such as neighboring cities' police departments, the County of San Diego, or the FBI to find and protect her daughter, or to try to borrow or otherwise secure the $2,500 ransom.

38. After Defendant Davis hung up on Plaintiff, Plaintiff's mother then immediately called the SDPD non-emergency line. The non-emergency line dispatcher, Dispatcher Defendant Laura Orozco, acting in the course and scope of her employment with the City, again affirmatively

tried to convince Plaintiff's mother that the kidnapping was a scam. Defendant Orozco did promise to call Metro PCS to try to trace Plaintiff's phone. Plaintiff cannot confirm whether Defendant Orozco actually did so.

39. Moreover, Defendant Orozco revealed that it was the SDPD's and the City's policy to treat reported kidnappings as scams. Plaintiff's mother informed Defendant Orozco that the prior 911 dispatcher (Defendant Davis) had told her the call was not an emergency, forcing Plaintiff's mother to wait on hold for at least 25 minutes for non-emergency line. Plaintiff's mother asked Defendant Orozco how someone trying to kill her daughter did not count as an emergency. Defendant Orozco responded that she believed that it was because "we're getting a lot of scams of these types." Defendant Orozco told Plaintiff's mother to call back if she actually got an address where Plaintiff was being held and could "confirm" the kidnapping in that way, then it would be "urgent" and she could call 911.

40. Plaintiff's mother acted in reliance on Defendant Orozco's words and actions and did not take more immediate action either to find and save her daughter herself, or go to a local police station, or to contact any other law enforcement agencies such as neighboring cities' police departments, the County of San Diego, or the FBI to find and protect her daughter, or to try to borrow or otherwise secure the $2,500 ransom.

41. Both Defendant Marvin and Defendant Orozco highlighted the importance of Plaintiff's mother providing the address where Plaintiff was being held, in order for them to take the reported kidnapping seriously and not treat it as a scam. Their comments were indicative of a ***broader, intentional policy of the City to only take action on a reported kidnapping if the person reporting it knows the hostage's address***. This policy, developed and maintained by the City, and its supervisor employees with policymaking authority Defendants Nisleit and Cahill, intentionally treats reported kidnappings where the hostage's location is unknown, as "scams" rather than legitimate kidnappings, or even missing persons cases. This policy encourages, ratifies and affirms the actions of dispatchers who only take action when they deem a kidnapping "confirmed" by obtaining the address of the hostage. This policy is not only patently absurd, because kidnappers

are unlikely to give the hostage's location in a ransom call, but it also violated Penal Code §§ 14210 *et seq.*'s requirements for the handling of missing persons cases, including stranger abduction cases. The policy also violated Plaintiff's due process rights to life and liberty.

42. Plaintiff had, in fact, been kidnapped. At 2:00 a.m. the following morning, April 12, 2018, a pedestrian found the Plaintiff lying in the cold ocean water at the bottom of the Sunset Cliffs. Plaintiff had been shot three times by Cesar Alvarado, Michael Pedraza and Britney Canale, and Plaintiff is now a quadriplegic.

43. Due to Plaintiff's mother's reliance on the Dispatcher Defendants' affirmative, active and concerted effort to persuade her that the kidnapping was a "scam" and "not an emergency," and that no further action, either by DEFENDANTS or by Plaintiff's mother, was necessary, Plaintiff's mother refrained from taking further action, such as to find and save the Plaintiff herself, or go to a police station, or contact any other law enforcement agencies such as the FBI to help find and protect her daughter, or attempt to borrow or otherwise secure the $2,500 to pay the ransom.

44. The Dispatcher Defendants thus increased the risk of harm to Plaintiff by their actions. Specifically, due to the Dispatcher Defendants' actions, Plaintiff was placed in a worse situation than she would have been in had the Dispatcher Defendants done or said nothing at all, because Plaintiff's mother refrained from taking further action, which led the kidnappers to harm Plaintiff to prove that they were "serious," and ultimately to shoot her, throw her off the Sunset Cliffs, and leave her for dead.

45. On information and belief, the City's dispatch call center was understaffed on April 11, 2018.

46. On information and belief, the Dispatcher Defendants had no training, were poorly supervised and their actions were grossly negligent as a result.

47. Also on information and belief, the City had actual notice and knowledge that the dispatch center was understaffed, that untrained and poorly supervised dispatchers such as Dispatcher Defendants were mishandling emergency calls and that the dispatch center maintained outdated and improper policies and procedures with respect to handling emergency calls, especially

those regarding reported missing persons or kidnappings.

48. Moreover, those in policymaking and supervisory positions, including Defendants City, and DOES 26 through 50, were deliberately indifferent and grossly negligent in the supervision and training of dispatchers (including a lack of training Dispatcher Defendants) in the handling of 911 calls, a lack of proper quality assurance practices, improper or outdated policies and procedures, and insufficient staff on duty. The acts and omissions of Defendants, collectively, were a proximate cause of Plaintiff's injury.

49. Moreover, on information and belief, the City's dispatch center failed yearly inspections for the years prior to the incident giving rise to this lawsuit, and notice of the failed inspections and severe lack of training at the dispatch center was given to Defendants, and all of them.

50. For many years before the subject incident and on the date of the subject incident, the City's emergency call dispatch center was a department in complete crisis.

51. It is believed that the City received and receives more than a million emergency calls per year.

52. In the years before the subject incident, the City's 911 call dispatch center was understaffed to a such a grossly negligent degree that emergency callers would go ignored. When the calls weren't ignored, the calls were placed on hold for so long that the "excessive wait times" fell recklessly below national standards thus endangering the citizens of San Diego and the Plaintiff.

53. In the years before the subject incident, the City's call dispatch center was understaffed to a such a grossly negligent degree that dispatch operators would regularly simply hang up on emergency calls endangering the citizens of San Diego and the Plaintiff.

54. The crisis was so systemic and well known in San Diego, that Mayor Kevin Faulconer promised to fix the "broken dispatch center" as a campaign promise in his candidacy for Mayor of San Diego.

55. The City, in the years before the subject incident, repeatedly was made aware that there was a serious problem – such as when a study found that 911 callers were placed on excessive wait times and incoming emergency calls went unanswered for more than 59 seconds before a dispatcher was able to answer. The national standard is a wait time of 10 seconds or less.




A screen shot of the San Diego Police dispatch center system that shows a wait time of 10 minutes.

56. In May of 2016, Michael Zucchet, General Manager of the San Diego Municipal Employees Association described the staffing of the 911 dispatch center as a "staffing crisis over the last several years" that "…has been an extremely stressful and difficult situation."

57. These failures by the City would result in a number of preventable tragedies such as when newborn baby Sebastian Caban was bitten by a dog in April 2016, a year before the subject incident. The newborn's parents called 911 and waited three minutes and 10 seconds for a 911 dispatcher to receive one its calls. The family had dialed 911 twice before. The couple waited 28 seconds before hanging up and calling back, then waited another 31 seconds before hanging up again. Photographs from the dispatch center showed 10 minute and five-minute waits for 911 calls to be answered.

58. In May of 2016, another well publicized failure for the City occurred with a county hospital nurse, Pamela Kennedy, waited a total of eight minutes for a dispatcher when an intruder broke in to her home. The City, in the years before the subject incident and at the time of the subject incident, knew that the dispatch center staffing levels had dropped to a level where the city's dispatchers would be unable to keep up with the volume of emergency calls and that emergency calls would be ignored. As far back as September 2013, San Diego City auditor Eduardo Luna recommended that the police department use 911 call data to improve its emergency response staffing. With the advent of cell phones, emergency call volumes continue to increase, while the budgeting and staffing for dispatchers continued to fall for the City.

59. The police department, itself, has admitted to an understaffed dispatch center for years now, and in 2016, was working to fill 21 vacancies of 134 budgeted positions.

60. The failure to even fill 134 budgeted positions is even more astounding because in 1989, the city employed significantly more 911 operators – 171 total. The City has not been able to reach its budgeted staffing levels for three years and as a result the city for three years has exercised its right to force dispatchers at times to work overtime just to maintain the service levels it offers today.

61. The dispatch center was so understaffed that the department recently offered to pay police officers overtime to staff a variety of dispatcher positions as a stopgap measure.

62. The continued failures of the dispatch center are generally seen through news stories as the City of San Diego Police Department no longer provides information about its emergency call performance in budget proposals.

63. Despite the above news stories and campaign promises, as of the time of the subject incident, the dispatch department was still broken.

//

//

//

//

**FIRST CAUSE OF ACTION**

**Gross Negligence and Bad Faith Against Dispatcher Defendants, Defendant City, and Does 4-50, Inclusive**

64. Plaintiff re-alleges and incorporates by reference all prior and subsequent paragraphs as though fully set forth herein.

65. Defendant Sue Marvin owed Plaintiff a duty of care and/or a duty to protect her based upon Marvin's affirmative actions to persuade Plaintiff that the kidnapping was a "scam" and that no further action was necessary. These acts placed Plaintiff in greater peril and/or increased the risk of harm to Plaintiff because Marvin's actions convinced Plaintiff's mother to refrain from taking further action. Consequently, Plaintiff's mother did not contact any other law enforcement agencies and did not attempt to find and save the Plaintiff herself, or go to a police station, or contact any other law enforcement agencies such as neighboring cities' police departments, the County of San Diego, or the FBI to help find and protect her daughter, or attempt to borrow or otherwise secure the $2,500 to pay the ransom.

66. Defendant Marvin acted with gross negligence because Marvin displayed a want of even scant care. Defendant Marvin actively flouted California Penal Code's requirements that missing persons reports – especially of people under 21 – be handled "without delay," with "priority," and with immediate referrals to the police to "make an assessment of reasonable steps to be taken to locate the person," issue a "Be On the Lookout" bulletin, and transmit the report to the Department of Justice. Instead, Defendant Marvin chose to instruct Plaintiff's mother that the kidnapping of her daughter was a scam, despite having knowledge that Plaintiff was in imminent danger. Defendant Marvin had no basis to reach the conclusion that the kidnapping was fake, let alone to actively direct and persuade Plaintiff's mother that no further action should be taken, including by Plaintiff's mother. Defendant Marvin's actions were in bad faith and an extreme departure from ordinary conduct and evidenced a want of even scant care. Defendant Marvin thus committed gross negligence and acted in bad faith.

67. Dispatcher Defendant Toneth Davis owed Plaintiff a duty of care and/or a duty to

protect her based on Defendant Davis' insistence to Plaintiff's mother that the kidnapping was "not an emergency" and her direction that Plaintiff's mother should call the City's non-emergency phone line. Defendant Davis' direction that Plaintiff's mother should call the City's non-emergency phone line placed Plaintiff in greater peril and/or increased the risk of harm to Plaintiff because Defendant Davis' actions convinced Plaintiff's mother to refrain from taking more immediate and urgent action. Consequently, Plaintiff's mother did not contact any other law enforcement agencies and did not attempt to find and save the Plaintiff herself, or go to a police station, or contact any other law enforcement agencies such as the FBI to help find and protect her daughter, or attempt to borrow or otherwise secure the $2,500 to pay the ransom.

68. Defendant Davis acted with gross negligence because Davis displayed a want of even scant care. Defendant Davis actively flouted California Penal Code's requirements that missing persons reports – especially of people under 21 – be handled "without delay," with "priority," and with immediate referrals to the police to "make an assessment of reasonable steps to be taken to locate the person," issue a "Be On the Lookout" bulletin, and transmit the report to the Department of Justice. in instructing Plaintiff's mother that the kidnapping of her daughter was not an emergency, despite having knowledge that Plaintiff was in imminent danger. Defendant Davis had no basis to reach the conclusion that the kidnapping was not an emergency, let alone to actively direct and persuade Plaintiff's mother that she should call the non-emergency line instead of taking more immediate and direct action. Defendant Davis' actions were based either on Defendant Marvin's bad-faith and grossly negligent conclusion that the kidnapping was a "scam" or her own baseless and reckless assumptions. For Defendant Davis to conclude that there was no emergency and to convince Plaintiff's mother of the same was in bad faith and an extreme departure from ordinary conduct. Defendant Davis thus committed gross negligence and acted in bad faith.

69. Dispatcher Defendant Laura Orozco also owed Plaintiff a duty of care and/or a duty to protect her based on Orozco's affirmative promise to Plaintiff's mother to contact Plaintiff's cell phone carrier to attempt to find Plaintiff. Defendant Orozco also owed Plaintiff a duty of care and/or a duty to protect her based upon Orozco's affirmative actions to persuade Plaintiff that the

kidnapping was a "scam" and that no further action was necessary. Defendant Orozco further placed Plaintiff in greater peril and/or increased the risk of harm to Plaintiff because Defendant Orozco's actions convinced Plaintiff's mother to refrain from taking more immediate and urgent action. Consequently, Plaintiff's mother did not contact any other law enforcement agencies and did not attempt to find and save the Plaintiff herself, or go to a police station, or contact any other law enforcement agencies such as the FBI to help find and protect her daughter, or attempt to borrow or otherwise secure the $2,500 to pay the ransom.

70. Defendant Orozco breached that duty and acted with gross negligence because Orozco displayed a want of even scant care. Defendant Orozco actively flouted California Penal Code's requirements that missing persons reports – especially of people under 21 – be handled "without delay," with "priority," and with immediate referrals to the police to "make an assessment of reasonable steps to be taken to locate the person," issue a "Be On the Lookout" bulletin, and transmit the report to the Department of Justice. Defendant Orozco thus committed gross negligence and acted in bad faith.

71. Defendant City is vicariously liable for the gross negligence and bad faith acts of Dispatcher and Does 4-25 under California Government Code section 815.2.

72. As a direct and proximate result of the Dispatcher Defendants' gross negligence and bad faith, and despite the knowledge that the Plaintiff was in imminent danger, Dispatcher Defendants did nothing to attempt to locate the Plaintiff, a duty they assumed when they first assured Plaintiff's mother that there was no kidnapping and no emergency, and then when they assured the Plaintiff's mother that they would take action locate the Plaintiff.

73. As a direct and proximate result of gross negligence and bad faith of the Dispatcher Defendants and Does 4 through 25, the Plaintiff was found by a pedestrian lying in the cold ocean water at the bottom of the Sunset Cliffs on April 12, 2018. Plaintiff had been shot three times by Cesar Alvarado, Michael Pedraza and Britney Canale and is now a quadriplegic.

74. The subject incident was foreseeable to Dispatcher Defendants because Plaintiff's mother informed them on multiple occasions that her daughter had been kidnapped and was at risk

of severe and immediate harm.

75. The acts and omissions of Dispatcher Defendants herein described that constitute gross negligence and bad faith (and their management, administrative, designers, planners, training personnel, maintenance personnel, inspectors and/or other employees, staff, agents or contractors, acting within the course and scope of their duties), proximately caused the injuries to Plaintiff.

76. Further, Dispatcher Defendants and the City, and their employees acting within the scope of their employment, acted in bad faith and failed to exercise even scant care in the performance of these undertakings and promises, the bad faith conduct and failure to exercise even scant care resulted in physical harm to the third persons; and either (a) their gross negligence increased the risk of such harm, or (b) the undertaking or promises were to perform a duty that the other owed to the third persons, or (c) the harm was suffered because either the other or the third persons relied on the undertaking.

## SECOND CAUSE OF ACTION

**Municipal Liability - Deliberate Indifference to Constitutional Rights:**

**Life, Liberty, Safety and Medical Needs (42 U.S.C. § 1983)**

**Against All Defendants And Does 4 Through 50, Inclusive**

77. Plaintiff re-alleges and incorporates by reference all prior and subsequent paragraphs as though fully set forth herein.

78. Plaintiff had a cognizable interest under the Substantive Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that deprive her of life, liberty, or property in such a manner as to shock the conscience, including actions that constitute deliberate indifference to serious medical needs, health, and safety, and from state actions that constitute violations of her civil right to prompt and adequate police services, emergency services and medical care.

79. Defendants, and each of them, violated Plaintiff's right to bodily security by delaying health and safety services and thus ensuring her injury.

80. Dispatcher Defendants put Plaintiff in a position of danger by their actions, including

by impeding access to safety services, police services, emergency services and medical care. Dispatcher Defendants knew that Plaintiff's mother had reported that she had been kidnapped, was being held for ransom, and at one point was being physically harmed and at imminent risk of being killed, and they increased the danger by treating the call as a scam and "not an emergency," and by demanding that Plaintiff's mother know and provide the address where the kidnappers had taken Plaintiff in order for them to "confirm" the reported kidnapping and take it seriously.

81. Dispatcher Defendants further increased the danger to Plaintiff by failing to determine that this call fell under the Missing Person category of Stranger Abduction; failing to ask Plaintiff's mother to identify Plaintiff's known associates, potential abductors, or other potential witnesses; failing to "give priority" to the report; failing to "make an assessment of reasonable steps to be taken to locate the person;" and failing to a "Be On the Lookout" bulletin or transmit the report to the Department of Justice in light of the fact that Plaintiff was under 21.

82. Instead, Dispatcher Defendants performed the above described grossly negligent acts.

83. The aforementioned actions of Dispatcher Defendants, along with other as yet undiscovered conduct, shock the conscience, in that they acted with deliberate indifference to the constitutional rights of Plaintiff, and with purpose to harm unrelated to any legitimate law enforcement objective.

84. Dispatcher Defendants thus violated the substantive due process rights of Plaintiff to be free from state actions that deprive her of life, liberty, or property in such a manner as to shock the conscience, including actions that constitute deliberate indifference to serious medical, health, and safety needs, and actions that constitute violations of her civil right to prompt and adequate police services and medical care.

85. As a direct and proximate cause of the acts of Dispatcher Defendants Plaintiff has suffered emotional distress, mental anguish, and pain.

86. The conduct of Dispatcher Defendants was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Plaintiff and therefore warrants the

imposition of exemplary and punitive damages as to Dispatcher Defendants.

## THIRD CAUSE OF ACTION

**Municipal Liability – Ratification (42 U.S.C. § 1983)**

**Against All Defendants And Does 4 Through 50, Inclusive**

87. Plaintiff re-alleges and incorporates by reference all prior and subsequent paragraphs as though fully set forth herein.

88. Dispatcher Defendants acted under the color of law.

89. The acts of Dispatcher Defendants deprived Plaintiff of her particular rights under the United States Constitution.

90. Upon information and belief, a final policymaker, acting under color of law, who had final policymaking authority concerning the acts of Dispatcher Defendants ratified (or will ratify) Dispatcher Defendants' acts and the bases for them. Upon information and belief, the final policymaker(s) knew of and specifically approved of (or will specifically approve of) Dispatcher Defendants' acts. These final policymakers include Defendants City, Cahill, Nisleit, and DOES 26-50, inclusive.

91. Upon information and belief, a final policymaker, including Defendants City, Cahill, Nisleit, and DOES 26-50, inclusive, have determined (or will determine) that the acts of Defendant Dispatchers were "within policy."

92. On information and belief, Defendant Dispatchers were not disciplined, reprimanded, retrained, suspended, or otherwise penalized in connection with Plaintiff's injuries and their above mentioned acts and failures.

93. Accordingly, Defendants City, Cahill, Nisleit, and DOES 26-50, inclusive each are liable to Plaintiff for compensatory damages under 42 U.S.C. § 1983.

//

//

//

//

**FOURTH CAUSE OF ACTION**

**Municipal Liability – Inadequate Training (42 U.S.C. § 1983)**

**Against All Defendants And Does 4 Through 50, Inclusive**

94. Plaintiff re-alleges and incorporates by reference all prior and subsequent paragraphs as though fully set forth herein.

95. Dispatcher Defendants acted under the color of law.

96. The acts of Dispatcher Defendants deprived Plaintiff of their particular rights under the United States Constitution.

97. The training policies of Defendant City were not adequate to train its dispatchers to handle the usual and recurring situations with which they must deal, including with regard to fielding and assessing 911 calls, transferring 911 calls to the appropriate dispatch, remaining on the line until the transfer is complete, and ensuring that the caller is properly connected to someone who can assist.

98. On information and belief, Defendants City, Cahill, Nisleit, and/or DOES 26 through 50 had actual notice and knowledge that the subject dispatch center was understaffed and that untrained and poorly supervised employees such as Dispatcher Defendants were mishandling 911 calls due to their lack of proper training and supervision.

99. Moreover, Defendants City, Cahill, Nisleit and/or DOES 26-50 were deliberately indifferent to the obvious consequences of their failures to train their dispatch center employees and other City employees adequately.

100. The failure of Defendants City, Cahill, Nisleit and/or DOES 26-50 to provide adequate training, including training to Dispatcher Defendants, caused the deprivation of Plaintiff's rights; that is, Defendant's failure to train is so closely related to the deprivation of Plaintiff's rights as to be the moving force that caused the ultimate injury.

101. Accordingly, Defendants City, Cahill, Nisleit and/or DOES 26-50 each are liable to Plaintiff for compensatory damages under 42 U.S.C. § 1983.

## FIFTH CAUSE OF ACTION

**Municipal Liability – Unconstitutional Custom or Policy (42 U.S.C. § 1983)**

**Against All Defendants And Does 4 Through 50, Inclusive**

102. Plaintiff re-alleges and incorporates by reference all prior and subsequent paragraphs as though fully set forth herein.

103. Dispatcher Defendants acted under the color of law.

104. The acts of Dispatcher Defendants deprived Plaintiff of their particular rights under the United States Constitution.

105. Dispatcher Defendants acted pursuant to either an expressly adopted official policy or a longstanding practice or custom of Defendants City, Cahill, Nisleit, and DOES 26-50.

106. On information and belief, Dispatcher Defendants were not disciplined, reprimanded, retrained, suspended, or otherwise penalized in connection with Plaintiff's injury. Defendants City, Cahill, Nisleit, and DOES 26-50, maintained, inter alia, the following unconstitutional customs, practices, and policies:

a. Providing inadequate training with respect to fielding 911 calls and transferring 911 calls to the appropriate dispatch;

b. Providing inadequate training with respect to handling reported kidnappings where the address is unknown, specifically the requirement that these be handled as missing persons cases;

c. Providing inadequate training with respect to taking reported kidnappings seriously and not dismissing them as scams;

d. Inadequately supervising, training, controlling, assigning, and disciplining City dispatch center employees, and other personnel, including Defendant Dispatcher Defendants, whom Defendants City, Cahill, Nisleit, and DOES 26-50, at all relevant times, knew or reasonably should have known were not adequately trained to field 911 calls;

e. Maintaining grossly inadequate procedures for reporting, supervising,

investigating, reviewing, disciplining and controlling misconduct by City dispatch center employees;

f. Maintaining a policy of inaction and an attitude of indifference towards mishandling of 911 calls, including by failing to discipline, retrain, investigate, and terminate dispatch center employees who mishandle 911 calls;

g. Maintaining a policy of inaction and an attitude of indifference towards understaffing at the subject dispatch call center, including by failing to hire and train an adequate number of individuals to meet the needs of 911 callers.

107. On information and belief, Defendants City, Cahill, Nisleit, and DOES 26-50, had actual notice and knowledge that the subject dispatch center was understaffed, that untrained and poorly supervised dispatch center employees such as Dispatcher Defendants were mishandling 911 calls, and that the subject dispatch center maintained improper and/or outdated policies and procedures with respect to handling 911 calls.

108. Defendants City, Cahill, Nisleit, and DOES 26-50, together with various other officials, whether named or unnamed, had either actual or constructive knowledge of the deficient policies, practices and customs alleged in the paragraphs above. Despite having knowledge as stated above, these defendants condoned, tolerated and through actions and inactions thereby ratified such policies. Said defendants also acted with deliberate indifference to the foreseeable effects and consequences of these policies with respect to the constitutional rights of Plaintiff, and other individuals similarly situated.

109. By perpetrating, sanctioning, tolerating and ratifying the outrageous conduct and other wrongful acts, Defendants City, Cahill, Nisleit, and DOES 26-50 acted with intentional, reckless, and callous disregard for the Plaintiff's constitutional rights. Furthermore, the policies, practices, and customs implemented, maintained, and still tolerated by Defendants City, Cahill, Nisleit, and DOES 26-50 were affirmatively linked to and were a significantly influential force behind the injuries of Plaintiff.

110. Accordingly, Defendants City, Cahill, Nisleit, and DOES 26-50 each are liable to

Plaintiff's for compensatory damages under 42 U.S.C. § 1983.

**SIXTH CAUSE OF ACTION**

**Unreasonable Search and Seizure - Denial of Constitutional Rights:**

**Life, Liberty, Emergency Services and Medical Care (42 U.S.C. § 1983)**

**Against All Defendants And Does 1 Through 50, Inclusive**

111. Plaintiff re-alleges and incorporates by reference all prior and subsequent paragraphs as though fully set forth herein.

112. Dispatcher Defendants violated Plaintiff's right to prompt and adequate emergency/police services and medical care by delaying her emergency police, ambulance/medical and other services, and thus ensuring her injury. Dispatcher Defendants knew that Plaintiff was suffering an emergency crisis that threatened her health and her life, and they denied police/emergency services to Plaintiff by failing to follow 911 call procedures, including but not limited to: failing to determine that this call fell under the Missing Person category of Stranger Abduction; failing to ask Plaintiff's mother to identify Plaintiff's known associates, potential abductors, or other potential witnesses; failing to "give priority" to the report; failing to "make an assessment of reasonable steps to be taken to locate the person;" and failing to a "Be On the Lookout" bulletin or transmit the report to the Department of Justice in light of the fact that Plaintiff was under 21. These failures resulting in a deprivation of her constitutional rights.

113. The actions of Dispatcher Defendants, including denial of emergency and police services, deprived Plaintiff of her right to be secure in her person against unreasonable searches and seizures as guaranteed to Plaintiff under the Fourth Amendment to the United States Constitution and applied to state actors by the Fourteenth Amendment.

114. Defendant Dispatcher Defendants knew that delaying Plaintiff's emergency, police or ambulance/medical services and otherwise impeding her access to these emergency services could result in significant injury or the unnecessary and wanton infliction of pain but intentionally or recklessly disregarded Plaintiff's serious needs, causing Plaintiff great bodily harm.

115. The conduct of Dispatcher Defendants was willful, wanton, malicious, and done with

reckless disregard for the rights and safety of Plaintiff and therefore warrants the imposition of exemplary and punitive damages as to Dispatcher Defendants.

116. As a result of their actions, Defendant Dispatcher Defendants are liable for Plaintiff's injuries.

**PRAYER FOR DAMAGES**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

1. General and special damages in excess of the minimum jurisdiction for an unlimited civil case, the exact amount according to proof;
2. For all medical, professional and incidental expenses, past and future, according to proof;
3. For all loss of financial earnings, past and future, according to proof;
4. For special damages, past and future, according to proof;
5. For all past and future damages;
6. For all costs of suit, according to proof;
7. For loss of the enjoyment of life, and other general damages, past and future, according to proof;
8. For all economic damages resulting from the destruction of personal property
9. All statutorily allowed damages;
10. Punitive damages; and
11. For such other and further relief as this court may deem just and proper.

Dated: December 27, 2019

Respectfully submitted:

**THE DOMINGUEZ FIRM**

Jennifer R. Bagosy, Esq.
Attorneys for Plaintiff, MYA HENDRIX

**DEMAND FOR JURY TRIAL**

Plaintiff MYA HENDRIX hereby demands a trial of all causes by jury.

Dated: December 27, 2019

Respectfully submitted:

**THE DOMINGUEZ FIRM**

Jennifer R. Bagosy, Esq.
Attorneys for Plaintiff, MYA HENDRIX

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of Los Angeles, State of California. My business address is 3250 Wilshire Blvd., Suite 2200, Los Angeles, California 90010.

On December 27, 2019, I served true copies of the following document(s) described as: **STIPULATION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT; [PROPOSED] ORDER** on the interested parties in this action as follows:

**SEE ATTACHED SERVICE LIST**

☐ **BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed on the Service List and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with The Dominguez Firm's practice for collecting and processing correspondence for mailing. On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

**X BY OVERNIGHT DELIVERY**: I enclosed the document(s) in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses listed on the Service List. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

☐ **BY FACSIMILE**: Based on an agreement of the parties to accept service by fax transmission, I faxed the document(s) to the persons at the fax numbers listed on the Service List. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed, is attached.

☐ **BY ELECTRONIC SERVICE**: Based on a court order or an agreement of the parties to accept electronic service, I caused the document(s) to be sent to the persons at the electronic service addresses listed on the Service List.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on December 27, 2019, at Los Angeles, California.

Levon Baghdasaryan

**SERVICE LIST**

*Hendrix vs. City of San Diego*

*Case No. 37-2019-00002275-CU-PO-CTL*

| | |
|---|---|
| Stacy J. Plotkin-Wolff, Esq.<br>SJPWolff@sandiego.gov<br>CamachoA@sandiego.gov<br>OFFICE OF THE CITY ATTORNEY<br>1200 Third Avenue, Suite 1100<br>San Diego, California 92101-4100<br>Telephone: (619) 533-5800<br>Facsimile: (619) 533-5856<br><br>Attorneys for Defendant<br>CITY OF SAN DIEGO | ***Via overnight delivery*** |