UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MYA HENDRIX, an individual,<br><br>                              Plaintiff,<br><br>v.<br><br>CITY OF SAN DIEGO, et al.,<br><br>                              Defendants. | Case No.:  20-CV-45 TWR (NLS)<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**<br><br>**(ECF No. 71)** |

The City of San Diego and the individual Defendants have moved to dismiss Plaintiff Mya Hendrix's Second Amended Complaint ("SAC," ECF No. 68) and moved to strike Defendants' Exhibits 2 and 7.  ("Mot.," ECF No. 71.)  Plaintiff opposed ("Opp'n," ECF No. 72) and Defendants replied ("Reply," ECF No. 73.).  For the reasons set forth below, the Court **GRANTS** the Motion to Dismiss and **DENIES AS MOOT** the Plaintiff's Motion to Strike.

## BACKGROUND

On April 11, 2018, Plaintiff was kidnapped by three individuals.  (*See* SAC ¶ 24.)  Plaintiff was 19 years old at the time.  (*See id*.)  Around 7:00 a.m. on the day of the kidnapping, Plaintiff called her mom, Misti Hendrix, to tell her that she had been kidnapped and that her kidnappers wanted $2,500 as ransom.  (*See id*. ¶ 25.)  In response to her daughter's call, Misti Hendrix called 911.  (*See id*. ¶ 26.)

The mother spoke to three dispatchers in total.  First, the mother spoke with Dispatcher Sue Marvin and reported Plaintiff's kidnapping.  (*See id*. ¶ 28.)  Marvin responded that kidnapping scams were common in San Diego, and that her daughter's situation was possibly one of them.  (*See id*. ¶ 30–31.)  Although the mother said that Plaintiff would not take part in a scam like that, Marvin convinced the mother that this was likely a scam, and the daughter's drug addiction is further reason to believe it may be a scam.  (*See id*. ¶ 34.)  Dispatcher Marvin offered to call Plaintiff's phone carrier to locate Plaintiff's phone.  (*See id.* ¶ 39.)  Dispatcher Marvin then called the phone carrier and was told that the phone carrier could not trace Plaintiff's phone.  (*See id*.)  Dispatcher Marvin relayed this information to Plaintiff's mother.  (*See id*.)  In response, Plaintiff's mother told Dispatcher Marvin that she had spoken to Plaintiff again, and based on her call, she doubted the kidnapping was a scam.  (*See id*.)  Dispatcher Marvin responded that Plaintiff's drug use was reason to doubt the threats and suggested that the mother not pay any ransom, stating that "sending her money is just gonna enable things." (*See id*. ¶ 40.)  Taking Marvin at her word, the mother did not seek additional help.  (*See id*. ¶ 41.)  Prior to being persuaded that the kidnapping was a scam, there were specific actions that the mother considered and was prepared to do, including paying the ransom or contacting other law enforcement agencies.  (*See id*.)  Several hours after Plaintiff's mother's last call with Marvin, Plaintiff called her mother again, crying.  (*See id*. ¶ 43.)  The kidnappers told the mother that if she did not pay the $2,500 as ransom, they would kill her daughter.  (*See id*.)  The mother called San Diego's 911 emergency phone line again and was connected to Dispatcher Toneth Davis.  (*See id*. ¶ 45.)  When the mother told Dispatcher Davis about Plaintiff's latest phone call, Dispatcher Davis responded that this was "not an emergency." (*See id*.)  Plaintiff's mother protested that the kidnappers were going to kill her daughter and that it was an emergency, but Dispatcher Davis said, "I have to keep calls open for emergencies," and told her to call the San Diego Police Department's ("SDPD") nonemergency line before hanging up.  (*See id*.)

/ / /

The mother immediately called SDPD's non-emergency line and was connected, after 25 minutes on hold, to Dispatcher Laura Orozco. (*See id*. ¶ 46.)   Like Marvin, Dispatcher Orozco told the mother that Plaintiff's kidnapping could be a scam. (*See id*. ¶ 47.) Dispatcher Orozco said that the SDPD had been getting "a lot of scams of these types," and if Plaintiff's mother had an address, then it would be "urgent," and she could call 911. (*See id*.)   Dispatcher Orozco revealed that it was the SDPD's and the City's policy to treat reported kidnappings as scams because the 911 line was "getting a lot of scams of these types." (*Id*. ¶ 59.)   Taking Orozco at her word, Plaintiff's mother did not seek further help or try to procure $2,500 to pay the kidnappers. (*See id*. ¶ 48.)

The following day, at 2:00 a.m., a pedestrian found Plaintiff lying in the ocean water at the bottom of Sunset Cliffs. (*See id*. ¶ 27.)   She had been shot three times and is now a quadriplegic. (*See id*.)

Plaintiff brings this suit against (1) Dispatchers Marvin, Davis, and Orozco, (2) San Diego's Police Dispatch Administrator, Roxanne Cahill, and SDPD's Chief of Police, David Nisleit, and (3) the City of San Diego.   Defendants have moved to dismiss.   (*See generally* ECF No. 71.)   For the reasons set forth below, the Court **GRANTS** the Motion to Dismiss and **DISMISSES** Plaintiff's Second Amended Complaint.

## LEGAL STANDARD

### I.   Federal Rule of Civil Procedure 12(b)(6)

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)).   "A district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is proper if there is a 'lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'"   *Id*. at 1242 (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).

/ / /

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In other words, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

"If a complaint is dismissed for failure to state a claim, leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)). "A district court does not err in denying leave to amend where the amendment would be futile." *Id.* (citing *Reddy v. Litton Indus.*, 912 F.2d 291, 296 (9th Cir. 1990), *cert. denied*, 502 U.S. 921 (1991)).

/ / /

/ / /

/ / /

/ / /

Further, "[t]he district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." *Allen v. City of Beverly Hills,* 911 F.2d 367, 373–74 (9th Cir.1990) (citations omitted) (affirming district court's dismissal and denying plaintiff leave to amend second amended complaint where further amendment would be futile).

## II.   Judicial Notice and Incorporation by Reference

When ruling on a Rule 12(b)(6) motion to dismiss, a court is generally limited to the allegations in the complaint. *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). This rule has two exceptions: (1) judicial notice and (2) incorporation by reference. Under Fed. R. Evid. 201, the court may take judicial notice of facts that are "not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. Incorporation by reference, on the other hand, is a "judicially created doctrine that treats certain documents as though they are part of the complaint itself." *Khoja v. Orexigen Therapeutics, Inc.,* 899 F.3d 988, 1002 (9th Cir. 2018). A court may incorporate a document by reference if "the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Unlike judicial notice, the court may take the contents of an incorporated document as true for purposes of a Rule 12(b)(6) motion to dismiss unless doing so would "only serve to dispute facts stated in a well-pleaded complaint." *Khoja*, 899 F.3d at 1003. A court may also consider documents upon which the complaint "necessarily relies." A complaint "necessarily relies" on a document if: "(1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).

/ / /

/ / /

/ / /

1

## ANALYSIS

2

## I.     Judicial Notice and Incorporation by Reference

3         Defendants incorporate by reference the audio recordings of: (1) the phone calls
4    between Plaintiff's mother and the Dispatchers; and (2) the Dispatchers' calls to Plaintiff's
5    cellular phone service provider, MetroPCS.  (*See* ECF 71-3, 71-5.)   For the reasons
6    discussed in the Court's August 11, 2021 Order, (*see* ECF No. 66 ("Order")), the Court
7    incorporates by reference the audio transcripts between Plaintiff's mother and the
8    Dispatchers.  Those conversations form the basis of Plaintiff's claims and can be properly
9    considered at this stage of the proceedings.  Plaintiff objects to the use of the audio
10   recordings of the Dispatchers' calls to Plaintiff's cellular phone service provider and moves
11   to strike the recordings and the references made to these exhibits in Defendants' Motion to
12   Dismiss.  ((*See* ECF 71-5, Exs. 2, 7, ("Exhibits 2 and 7").)  Defendants cite Exhibits 2 and
13   7 in their Motion at 9:3–5; 9:9–11, 12:28–13:1. (*See* Mot. at 9,12–13.)   Defendants
14   subsequently withdrew Exhibits 2 and 7, which Defendants claim were submitted in error.
15   (*See* Reply at 2.)   In light of Defendants withdrawal, the Court considers the move to strike
16   moot.  The Court will not consider Exhibits 2 and 7, including the specific references to
17   the exhibits in the Motion to Dismiss, 9:3–5; 9:9–11, 12:28–13:1.  (*See* Mot. at 9, 12–13.)

18

## II.    Gross Negligence and Bad Faith

19        Plaintiff reasserts claims in her Second Amended Complaint of gross negligence and
20   bad faith against the City and the Dispatchers under California Government Code §§
21   815.2(a) and 820(a), respectively.  (*See* SAC ¶¶ 18–19, 83–96.)   Under California
22   Government Code § 815.2(a), "[a] public entity is liable for injury proximately caused by
23   an act or omission of an employee of the public entity within the scope of his employment
24   if the act or omission would, apart from this section, have given rise to a cause of action
25   against that employee or his personal representative." Cal. Gov't Code § 815.2(a).  Under
26   California Government Code 820(a), "a public employee is liable for injury caused by his
27   act or omission to the same extent as a private person." Cal. Gov't Code § 820(a).  The
28   Court addresses the gross negligence and bad faith allegations below.

### A. Dispatcher Defendants

Plaintiff argues that the Dispatcher Defendants are liable for gross negligence and bad faith. (*See* SAC ¶¶ 83–89.) However, Plaintiff has not set forth a plausible theory that the Dispatchers owed a duty to the Plaintiff. Under California law, gross negligence requires the same showing as ordinary negligence, which means the plaintiff must allege duty, breach, causation, and damages. *See Gomez v. Nissin Foods Co.*, No. CV 18-7257 PA (AGRX), 2019 WL 6825746, at *3 (C.D. Cal. July 5, 2019) (internal quotation marks and citation omitted). Importantly, one does not have a duty to come to the aid of another. *See Zepeda v. City of Los Angeles*, 223 Cal. App. 3d 232, 235 (1990). This duty —or lack thereof—also is applicable to law enforcement and emergency rescue personnel. (*See id.*) As a general rule, "a person who has not created a peril is not liable in tort merely for failure to take affirmative steps to assist or protect another unless there is some special relationship between them which gives rise to a duty to act." *Id*. at 235. Whether or not a duty exists is primarily a question of law. *See id*. If a duty does exist, to establish gross negligence "a plaintiff must show 'the lack of even scant care or an extreme departure from the ordinary standard of conduct.'" *Williams v. Kohl's Dep't Stores, Inc.*, No. EDCV19397JGBSHKX, 2020 WL 3882953, at *29 (C.D. Cal. June 16, 2020).

Plaintiff alleges each Dispatcher owed her a duty of care based on their "affirmative actions" of convincing Plaintiff's mother that the kidnapping was scam or a non-emergency, which caused Plaintiff's mother to refrain from taking further action to help her daughter. (*See* SAC ¶¶ 84, 86, 88.) Plaintiff contends that these affirmative acts placed Plaintiff in greater peril and/or increased the risk of harm to Plaintiff, and as such, created a special relationship sufficient to give rise to liability. (*See id.*) The Court previously found that the Dispatchers did not try to convince the mother that Plaintiff's kidnapping was a scam, and no statements give rise to such an inference. (*See* Order at 10.) The Court reasoned that because the Dispatchers did not take the affirmative action of convincing the Plaintiff's mother that the kidnapping was a scam, no special relationship was created, and thus the Dispatchers owed no duty to Plaintiff. (*See id.*) Plaintiff's Second Amended

Complaint does not provided facts sufficient to persuade the Court to change its previous ruling.

### 1.  Special Relationship

Under California law, a special relationship arises "most frequently" in cases where "some act or omission on the part of the defendant … created a risk or increased an existing risk to a known person."  *See Zepeda,* 223 Cal. App. 3d at 235.  According to Plaintiff, the Dispatchers put Plaintiff at a greater risk of physical harm by convincing her mother that the kidnapping was a scam or not an emergency. (*See* SAC ¶¶ 84, 86, 88.)  That is, Plaintiff alleges that the Dispatchers induced reliance through their assessment that the kidnapping was a scam, and upon relying on the Dispatchers' assessments, Plaintiff's mother decided to not seek additional assistance, call other law enforcement, or procure the ransom money. (*See id.*)  This reliance resulted in a delay of action which increased the harm the Plaintiff faced.  (*See id.*)

Plaintiff's Second Amendment Complaint fails to provide sufficient facts to support a Special Relationship.  Plaintiff summarizes the "critical new facts" in her Second Amended Complaint as follows: (1) "Dispatcher Marvin instructed Misti Hendrix [Plaintiff's mother] not to pay the ransom because she believed Plaintiff had not been kidnapped but was just fishing for drug money (SAC ¶ 40)"; (2) Plaintiff's mother "had the means to pay the ransom (Id. ¶ 36)"; and (3) Plaintiff's mother "did not pay the ransom because the Dispatchers, particularly Marvin, ensured she did not take the kidnapping as seriously as she otherwise would have (*Id*. ¶¶ 24–48.)." (*See* Opp'n at 7–8.)  The Second Amended Complaint further pleads that these efforts were successful, and Plaintiff was tortured and ultimately shot as a result.  (*See* SAC ¶¶ 28–48, 62–63.)  The additional Dispatcher recordings and the additional fact that the mother was able to pay the ransom is not enough to establish a special relationship between the Dispatchers and Plaintiff.  The Court has thoroughly reviewed the transcripts of the Dispatcher recordings and respectfully disagrees with Plaintiff's characterization of those transcripts.  The transcripts confirm that Dispatchers were not trying to convince Plaintiff's mother that the kidnapping was a scam.

Plaintiff relies on *Arista* and *Mann* to establish that a special relationship exists between the Dispatchers and Plaintiff. (*See* Opp'n at 12–13.); s*ee also Arista v. County of Riverside* 29 Cal. App. 5th 1051 (2018); *Mann v. State of California* 70 Cal. App. 3d 773 (1977). In *Arista*, the court found a special relationship existed when an officer took affirmative steps to rescue the plaintiff, on which the plaintiff's wife relied, and the officer failed to exercise due care in performing the rescue. *See Arista,* 29 Cal. App. 5th at 1061. The family was told the officers would "handle" the search and requested that the wife not initiate any search on her own. *See id*. at 1056. The sheriff's department took several affirmative steps to assume the responsibility of rescuing the victim and thus established a duty of care. *See id*. Notably, the sheriff's department, "(1) pinged the victim's cell phone, which led to the discovery that the victim's cell phone was on Santiago Peak; (2) collected information about the victim from Wife; (3) instructed Verizon personnel to 'be vigilant for [the victim's location]'; (4) placed deputies at trailheads; (5) set a time to start searching the area for the victim; and (6) appointed an Incident Commander." *Id*. at 1061. The officer delayed the search in bad faith, and assumed the plaintiff was not missing, but was having an affair. *See id*. The victim's wife began her own search once she learned of the delay, proving to the court that she detrimentally relied on the officer's search efforts. *See id*. at 1062. Due to freezing temperatures on the day of the incident, delaying the search was a factor in the plaintiff's death by hypothermia. *See id*. at 1056. Thus, in *Arista*, the officer affirmatively assumed responsibility to execute the search and induced the plaintiff's wife to rely upon his assumption of search responsibilities. The officer's decision to begin the search next morning forced plaintiff to endure freezing conditions, a worse position than he would have been in if the plaintiff's wife did not rely on the officer's promise and affirmative acts.

In *Mann*, the court found that "once a state traffic officer has chosen to investigate the plight of the specific persons on a freeway and informed himself of the foreseeable danger to them from passing traffic, a special relationship requiring him to protect them by readily available means arises." 70 Cal. App. 3d at 780. Liability may attach if the officer's

limited duty to protect these people under these special circumstances is not performed. *See id*.   The state's liability was predicated on the conduct of the officer, when, after stopping and investigating stalled cars, he failed to inform individuals at the scene to enter their respective cars to avoid injury. *See id*. at 776.   Further, when he left the scene unannounced, he did not ensure that the scene he left was safe. *See id*.   Consequently, the stalled car was sideswiped by a passing car due to lack of visibility, and the plaintiff was injured. *See id*. at 777.   The officer's conduct to voluntarily assist the cars on the road, call the tow truck, and set up safety measures—protective flares and rearward flashing lights—induced reliance and formed a special relationship with the plaintiff. *See id*.   The officer lulled the injured parties into a false sense of security and potentially prevented other assistance from being sought. *See id*.   The officer did not uphold the promise that was reasonably inferred and was detrimentally relied upon. *See id*.

The facts in this case are far removed from both *Arista* and *Mann*.  Plaintiff claims that the Dispatchers had taken enough affirmative steps to form a special relationship between the Dispatchers and Plaintiff. (*See* Opp'n at 13.)   Plaintiff argues that the Dispatchers affirmatively persuaded the mother that the kidnapping was a "scam," and that no further action by the mother was necessary, including not paying the ransom. (*See* SAC ¶¶ 84–88.)

First, the Dispatchers did not assume responsibility for handling Plaintiff's case and continued to make clear that they were unable to execute a rescue mission without a location. (*See* SAC ¶¶ 33, 47, 59, 61.)   In both *Arista* and *Mann*, a promise was made, and expectations were set that concretely established reliance by the plaintiffs and thus formed special relationships. *See* Cal. App. 5th at 1051; *See also* 70 Cal. App. 3d at 773.  It is not reasonable to infer that the Dispatchers lulled Plaintiff's mother into a false sense of security, as no promises were made, and there could be no logical assumption that aid would be rendered and that the mother should not take further action.

Second, the facts alleged do not show that the Dispatchers affirmatively persuaded the mother that the kidnapping was a scam.  The Dispatchers never told Plaintiff's mother

not to act and that the kidnapping was a scam.  Further, telling the mother that her call was not an emergency, on its own, does not constitute an affirmative act that triggers a duty.  In *Arista*, the officers told the family that they would "handle" the search and requested that the wife not initiate any search on her own, which is in stark contrast to the facts here.  *See* Cal. App. 5th at 1056.  The Dispatchers did not indicate that they had the case "handled," and continually encouraged the mother to take further action.  When examining what Marvin, Davis, and Orozco said to Plaintiff's mother, it is clear they were not trying to convince Plaintiff's mother that the kidnapping was a scam and did not deter further action by the mother, but in fact continued to encourage the mother to obtain more information to help locate the Plaintiff.  (*See* Mot., Ex. 8 at 11:13–15, 13:14–18, 14:19–22, 34:19–23).  Evidenced by Plaintiff's mother's actions after her calls with the Dispatchers, Plaintiff's mother was not convinced the kidnapping was a scam.  Plaintiff's mother continued to call emergency services and did not quit searching for the Plaintiff based on the Dispatcher's comments.  Plaintiff fails to establish that a special relationship existed, as the Dispatchers did not: (1) indicate that they had the case "handled," (2) definitively conclude and communicate that the kidnapping was a scam, and (3) convince Plaintiff's mother that the kidnapping was a scam.  In short, the Dispatchers did not assume responsibility over the case or induce reliance by the comments they made in reference to the kidnapping.

Finally, Plaintiff's mother's allegation that the Dispatchers are the reason she did not pay the ransom, even though she had the ability to pay the ransom, does not alter the Court's finding regarding the lack of a special relationship.  Dispatcher Marvin informed Plaintiff's mother that if the kidnapping was a scam, and Plaintiff was trying to get money for her drug addiction, then Plaintiff's mother should not enable her.  (*See* Mot., Ex. 8 at 23: 10–25.)  However, Marvin was not trying to persuade Plaintiff's mother that the kidnapping was a scam and, by extension, to not pay the ransom.  Marvin took the mother's call seriously, asked that the mother to tell Plaintiff to call 911 so that she could locate her and send help, and before hanging up, provided an event number so that Plaintiff's mother could call back when she had more information.  (*See* Mot., Ex. 8 at 24:1–12.)  Marvin had

no knowledge that Plaintiff's mother could pay the ransom and Plaintiff's mother continued to remind Marvin that paying the ransom would be impossible.  (*See* Mot., Ex. 8 at 7:8–11; 11:22–25; 13:22–25; 18:23–25; 20:5–10; 24; 2–9.)  Additionally, there is no allegation that the payment of a ransom is proper protocol for a missing person or kidnapping report.  (*See* California Penal Code § 14210, et seq; *see also* California Penal Code § 13519.1.)

The record before the Court fails to establish that the Dispatchers actively persuaded Plaintiff to refrain from talking further action in locating Plaintiff or from paying the ransom.  Since the Dispatchers did not assume responsibility of the matter or try to convince the mother that Plaintiff's kidnapping was a scam, Plaintiff's claims for gross negligence and bad faith fall short.  There was no special relationship between the Dispatchers and Plaintiff, so the Dispatchers owed no duty.[1]

### 1.   The City

Plaintiff also asserts gross negligence and bad faith against the City.  As noted above, the City's liability is based on California Government Code 815.2(a), which provides "[a] public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative."  Cal. Gov't Code § 815.2(a).  In other words, this statute allows for vicarious liability.  *See Luttrell v. Hart*, No. 5:19-CV-07300-EJD, 2020 WL 5642613, at *6 (N.D. Cal. Sept. 22, 2020) ("California Government Code Section 815.2 explicitly provides for vicarious liability.").  Here, because the Dispatchers did not owe a duty and cannot therefore be liable for gross negligence, by extension, the City is not liable.

Given this is the Second Amended Complaint, and all facts available have likely been alleged, the Court finds that any further amendment to the complaint would be futile.

---

[1]    Because the Dispatchers did not owe a duty to Plaintiff, the Court does not have to address whether the Dispatchers' actions were grossly negligent.  (Opp'n at 13–16.)

The Court has reviewed all the authenticated transcripts available, which are central to the claim, and determines that the Dispatchers did not assume responsibility of the matter, persuade Plaintiff's mother that the kidnapping was a scam, and dissuade Plaintiff's mother from paying the ransom.  The applicable statutes and case law simply do not give rise to a duty owed to Plaintiff from the Dispatchers or the City.  Where amendment would be futile, dismissal may be ordered with prejudice.  *See DeSoto*, 957 F.2d at 658.  The Plaintiff's claims against the Dispatchers and the City for gross negligence and bad faith are **DISMISSED WITH PREJUDICE.**

### A.     28 U.S.C. § 1983 Claims against "All Defendants"

Plaintiff alleges Defendants violated her constitutional rights under the "state created danger" doctrine. (*See* SAC ¶¶ 98–99).  Plaintiff's Second Amended Complaint pleads facts demonstrating that the Defendants affirmatively acted in a way that increased the danger to Plaintiff's life and liberty, or, at minimum, made her more vulnerable to danger. This argument fails for the same reasons the Plaintiff's first amended complaint failed.

### 1.   Section 1983 Claims against the Individual Dispatchers

"To state a claim under § 1983, a plaintiff [1] must allege the violation of a right secured by the Constitution and laws of the United States, and [2] must show that the alleged deprivation was committed by a person acting under color of state law." *Naffe v. Frey*, 789 F.3d 1030, 1035–36 (9th Cir. 2015) (quoting *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)).  Plaintiff argues that by convincing her mother that the kidnapping was a scam and delaying the investigation by trying to ascertain if the kidnapping was scam, the Dispatchers violated the Substantive Due Process Clause of the Fourteenth Amendment under the "danger creation exception."  (*See* SAC ¶ 101).  The danger creation exception applies when a state action "affirmatively place[s] the plaintiff in a position of danger," or "where state action creates or exposes an individual to a danger which he or she would not have otherwise faced." *Johnson v. City of Seattle*, 474 F.3d 634, 639 (9th Cir. 2007) (internal quotation marks altered and citation omitted).  According to Plaintiff, the Dispatchers increased the risk of danger to Plaintiff by: (1) persuading

Plaintiff's mother that the kidnapping was a scam; (2) persuading Plaintiff's mother that because the kidnapping was likely a scam there was no urgency for her to take action; (3) "affirmatively instructing Plaintiff's mother not to pay the ransom lest she 'enable' Plaintiff's drug habit;" (4) wasting time by trying to ascertain if the kidnapping was a scam, and (5) wasting time by treating the kidnapping as "not an emergency" if an address is not known and a 25 minute wait time to get connected to the non-emergency line.  (*See Id*. ¶ 101).

Plaintiff's Section 1983 claim must meet three criteria, (i) Dispatcher Defendants affirmatively placed Plaintiff in a position of danger or exposed Plaintiff to a danger which he or she would not have otherwise faced, (ii) the danger to which Defendants exposed Plaintiff was known or obvious, and (iii) Defendants acted with deliberate indifference to that risk.  *See Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061, 1062–64 (9th Cir. 2006). Plaintiff is unable to meet the first prong and thus the danger creation exception does not apply.  Plaintiff lists several inactions by Defendants in the Second Amended Complaint, including, the failure to make the report a priority, neglecting to make a list of steps to be taken, and not reporting the call to the Department of Justice. (*See id*. at 106).  However, taking no affirmative step and merely knowing a potential danger exists does not amount to state-created danger.  *See L.W. v. Grubbs (Grubbs I),* 974 F.2d 119, 121 (9th Cir.1992) ("The 'danger creation' basis for a claim, by contrast, necessarily involves *affirmative* conduct on the part of the state in placing the plaintiff in danger") (emphasis added); *Majors v. City of Oakland*, No. C 05-00061 CRB, 2005 WL 2216955, *4 (N.D. Cal. July 25, 2005) (holding that "[t]he Oakland Police Department might have understood that taking no action to break up the disruption in the church could have left plaintiffs in danger; [. . . but] their refusal to act is not an affirmative creation of an already existing danger"). The applicable affirmative act alleged is the that the Dispatchers convinced Plaintiff's mother that the kidnapping was a scam, and that the mother should take no further action, including to not pay the ransom.  As explained above and in the prior Order, the facts alleged do not support Plaintiff's claim that the Dispatchers tried to convince or

successfully convinced the mother that the kidnapping was a scam and that the ransom should not be paid.  Furthermore, Plaintiff has not alleged facts to establish that the alleged delays, from labeling the kidnapping a non-emergency, or ascertaining if the kidnapping was a scam, affirmatively placed plaintiff in a position of danger she would not have otherwise faced.  The danger creation exception therefore does not apply and Plaintiff's Section 1983 claim against the Dispatcher Defendants fails.   The Court therefore **DISMISSES** this claim **WITHOUT PREJUDICE**.

### 2.   Section 1983 Claims Against Cahill, Nisleit, and the City

Plaintiff asserts supervisory liability claims against Defendants Cahill and Nisleit. (*See SAC* ¶¶ 118.)  Plaintiff also asserts municipal liability claims against the City. (*See id*.)  Because the Court finds that no constitutional violation occurred, the claims against Cahill, Nisleit, and the City necessarily fail.  *See Corales v. Bennett*, 567 F.3d 554, 570 (9th Cir. 2009) (finding no supervisory liability without an underlying constitutional violation); *see also Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 957 (9th Cir.2008) ("Because there is no constitutional violation, there can be no municipal liability.").[2]  The Court therefore **DISMISSES** this claim **WITHOUT PREJUDICE**.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[2]      Here, Plaintiff asserts supervisory liability claims against Cahill, Nisleit and the City for (1) ratification, (2) failure to train and supervise, and (3) implementing a custom or policy that resulted in deliberate indifference to Plaintiff's rights.  Because the Court finds no underlying constitutional violation to Plaintiff's rights, and thus no supervisory liability, the Court does not need to address how Cahill, Nisleit and the City were liable.

15

## CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendants' Motion to Dismiss **WITH PREJUDICE** as to the first cause of action and **WITHOUT PREJUDICE** as to the second, third, fourth and fifth cause of action.  Plaintiff will have <u>thirty (30) days</u> from the date of this Order to file an amended complaint.  The Court **DENIES AS MOOT** the Plaintiff's Motion to Strike.

**IT IS SO ORDERED.**

Dated:  June 2, 2022

_____
Honorable Todd W. Robinson
United States District Judge

20-CV-45 TWR (NLS)